UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JEROME MCDONALD, a single man,<br><br>    Plaintiff,<br><br>    v.<br><br>HOLLAND AMERICA LINE INC., a Washington corporation.<br><br>    Defendant. | CASE NO. C04-2487RSM<br><br>ORDER ON MOTION FOR SUMMARY JUDGMENT |

This matter is now before the Court for consideration of defendant's motion for summary judgment on all claims. Oral argument was heard on January 10, 2006, and the parties' memoranda, exhibits, and arguments have been fully considered. For the reasons set forth below, defendant's motion shall be GRANTED IN PART and DENIED IN PART.

FACTUAL BACKGROUND

Plaintiff Jerome McDonald filed this suit as a diversity action, alleging state law claims of defamation, intentional and negligent infliction of emotional distress, and false light invasion of privacy. Plaintiff resides in Arizona, and Holland America Lines, Inc. ("HAL") is a Washington corporation. HAL is named as the "agent of several foreign corporations" which own the cruise ship M/S *Oosterdam*, upon which the events giving rise to this suit occurred.

The facts, as stated in the complaint and as gleaned from e-mails and depositions provided in the record, are as follows: Plaintiff booked two tickets on a Caribbean cruise with HAL in a deluxe suite.

ORDER - 1

He invited an acquaintance, Pieter Dijkstra, to join him and bought Mr. Dijkstra a first-class airline ticket. The cruise departed from Florida on Sunday, January 11, 2004.  Mr. McDonald, who was employed at the time in the computer industry as "in-house installer" in the Information Technology ("IT") department of PF Chang's (a restaurant chain),  brought his laptop computer along.  On the first day of the cruise, he attempted to use the wireless connection in his suite to access the internet.  However, his computer connected directly (without the input of a password) to a network called Üradar.  He tried to connect to the internet several times with the same result.  The following day, January 12, when he experienced the same trouble, he went to the Neptune Lounge (available to suite passengers) and reported the problem to Amber, who was Manager of Guest Relations ("GRM").  On January 13, Amber directed Mr. McDonald to go to the ship's internet café for help with the problem.   According to plaintiff, an employee there stated to him that he "may have connected to one of the ship's 'private' networks."  Complaint, ¶ 13. Plaintiff also mentioned the connection problem to the purser, Jim Leary, on January 13.  Mr. Leary states that plaintiff said "he was pretty sure that he had logged onto the Bridge.  He assured me that he did nothing to alter any data in the system."  On January 14, plaintiff brought his computer into the Neptune Lounge and demonstrated the problem to Mr. Leary.   An e-mail from Mr. Leary to security states that plaintiff "logged on to show to me that he did not have to do anything to log onto the Üradar network except for [sic] turn on his computer."   However, Amber's notes of the same event state,

> Mr McDonald actually showed Jim Leary, PSA, how he had our computer system up on his computer.  He said it was just happening automatically, and that he wasn't actually doing any 'hacking', that there was no firewall or password to get into our computer network, however, Jim did actually see a password, which when visible on the screen, Mr McDonald quickly closed down.

Declaration of Paul Smith, Exhibit I.  Plaintiff asserts that when the ship's IT specialist Dave inspected his computer, he determined that Üradar was not part of the ship's network.  However, it appears to this Court that Dave's report was inconclusive.  No one from HAL has confirmed (or denied) on the record before the Court that Üradar actually is part of the ship's navigation system or other on-board system.

On January 14, sometime around 3:00 pm local time, the ship experienced a  "crash" in the "Fidelio" system, which manages customer billing.  Mr. Leary notes that plaintiff was very familiar with

ORDER - 2

Fidelio software from his PF Chang employment. The ship was docked at Ocho Rios, Jamaica, at the time. The gangway log, which shows passenger movement off and on the ship, shows that plaintiff went ashore at 11:55 am, and returned at 15:09 (3:09 pm). However, the "Vingcard" log, which monitors the passenger door locks, shows that plaintiff entered his room at 14:10 and 14:20 on the same day—when he was supposedly ashore. The gangway log is maintained with the Fidelio software; the Vingcard log is not. The ship's chief officer, in an e-mail to Cees Deelstra at HAL, questioned whether Mr. McDonald could have altered the Fidelio log to indicate that he was off the ship at a time when he actually was on board. After the cruise, the crash of the Fidelio system was determined to have been caused by HAL technicians working on the system to apply an "upgrade patch". Declaration of Thomas Gilman, Exhibit 4.

In the meantime, plaintiff and his roommate had a falling out, on the evening of January 13. Mr. Dijkstra came to the GRM and asked for a separate room, claiming he was afraid of Mr. McDonald. The GRM (Emma) reported that "it was mentioned by Mr D, that Mr M is not only crazy but he is brilliant in computers—he has his laptop here and Mr D says that he is able to log into the ships network. Normally I wouldn't believe this BUT he mentioned that he was on the Engineers 'U' drive—how else would he know this? Dave is aware."

Mr. McDonald, for his part, asked the GRM (Amber) to "disembark" Mr. Dijkstra. She responded that they could not do that, at which point Mr. McDonald began "shaking and getting agitated." He refused to allow Mr. Dijkstra back into the room to collect his belongings, including his passport and clothing. According to the e-mails among the crew, sometime on the evening of January 14, Mr. Dijkstra told Jim Leary that he was "willing to talk about what Mr. McDonald did to our system." Mr. Leary reported this comment to the ship's security officer and to the GRM.

On January 15, as noted above, Dave the IT officer visited Mr. McDonald in his suite and inspected the computer. He confirmed that when switched on, the computer acquired a wireless network

ORDER - 3

named Üradar. He ran various checks for IP addresses, but the result appears to be inconclusive.[1]  Later that morning, Mr. McDonald appeared in the Neptune Lounge and said to Amber, "So, they found the hole!", apparently referring to the "hole" in the ship's computer system that allowed him access. He also demanded a meeting with the ship's hotel manager ("HM"), which was set up for 4:30 that afternoon. Amber later advised plaintiff by voice message that security and Mr. Dijkstra would be going into his suite at 1:30 pm to retrieve Mr. Dijkstra's belongings. Mr. McDonald refused to let Mr. Dijkstra into the room, but Mr. Dijkstra agreed to let Mr McDonald pack his things for him. The GRM and security officer went along to help and reported that

> Mr. M literally just ripped Mr. D's clothing out of the wardrobe and threw them in the suitcase—he took his personal items and toiletries and put them in the rucksack. Mr. M is demanding the tuxedo that Mr. D is still wearing from the last formal night. Mr. D agreed that a [sic] soon as he got his luggage back he would return the tuxedo.

At the 4:30 meeting with the Hotel Manager, plaintiff asked for a letter clearing him of any "hacking" charges. He also wanted an apology regarding the behavior of the Neptune Lounge employees, Amber and Emma. He did not get either.

These events were reported to Charles Mandingo, HAL director of fleet security in Seattle. Mr. Mandingo relayed the computer-related allegations to the FBI. When the ship docked at Port Everglades, Florida, on January 18, FBI agents were waiting for plaintiff with a search warrant. He was detained for several hours, during which the search uncovered some methamphetamine hidden in plaintiff's computer case. Plaintiff was later charged in Florida state court with possession of methamphetamine. No charge related to the computer hacking allegation was ever brought.

## LEGAL ANALYSIS

The complaint alleges four causes of action, all based on HAL's report to the FBI: defamation, intentional infliction of emotional distress (outrage), negligent infliction of emotional distress, and false light invasion of privacy. Defendant has moved for summary judgment as to all four claims. In his response, plaintiff abandoned the false light claim, so summary judgment may be granted on that claim

---

[1] Defendant has not provided a declaration from Dave with an explanation, for the uninitiated, of the actual meaning of his cryptic notes, or his conclusion.

ORDER - 4

without further discussion.

Defendant asserts that plaintiff also failed to come forward with any evidence of physical harm to sustain his claim of negligent infliction of emotional distress. In the absence of such physical harm, a negligence claim is contractually barred by his contract of carriage. Plaintiff's contention that his one- or two-hour detention during the search constitutes physical harm is unpersuasive. Summary judgment is appropriate as to this claim as well.

As to plaintiff's remaining claims of defamation and intentional infliction of emotional distress, defendant asserts the same two arguments: that plaintiff cannot prove falsity of the statements, and that the report was protected by privilege under RCW 4.24.510. These claims merit separate analysis.

I. <u>Falsity</u>.

Under Washington law, a claim of defamation requires the unprivileged publication of a false statement to a third party, which causes damages. Ordinarily, a private individual need only prove that a defendant negligently published a false statement about him. *Taskett v. King Broadcasting Co.*, 86 Wash.2d 439, 444 (1976). The burden of proving that the allegedly defamatory statement was false is on the plaintiff. *Mohr v. Grant*, 153 Wash. 2d 812, 817 (2005). The plaintiff also bears the burden of establishing that no privilege protected the defendant's statement. *LaMon v. Butler*, 112 Wash. 2d 193, 195 (1989). Finally, the plaintiff must prove that the defamatory statements damaged him, unless he can prove that the statements were defamatory per se. In that case, damages are presumed. *Maison de France, Ltd., v. Mais Oui!, Inc.*, 126 Wash.App. 34, 53 (2005). An accusation of a criminal offense of moral turpitude is defamatory per se. *Id.* at 44, citing *Ward v. Painters' Local Union No.* 33, 41 Wash. 2d 859, 863 (1953).

HAL's first basis for summary judgment on the defamation claim is the contention that plaintiff has no evidence to prove that HAL's statements to the FBI were false. This argument flows from HAL's position that the only statement about plaintiff made to the FBI was that Mr. Dijkstra claimed that plaintiff had hacked into the ship's computer. In other words, HAL states that it did not report its own suspicions regarding Mr. McDonald's activities, only Mr. Dijkstra's allegations. Because it is indisputable that Mr. Dijkstra did make the allegations, there was, in HAL's view, no "false statement"

ORDER - 5

communicated to the FBI.   This argument is somewhat disingenuous.

The only evidence in the record as to what HAL personnel actually communicated to the FBI is contained in the deposition of Charles Mandingo and the search warrant application and affidavit of Special Agent George Nau.  When asked whether he told FBI agent Grazier "that Holland America suspected that Mr. McDonald might be attempting to hack into the ship's computer," Mr. Mandingo responded, "Yes.  I would have identified that we had information that would indicate the possibility that he had hacked into the computer system." Mandingo Deposition, p. 42.  The affidavit of Special Agent Nau, which is based entirely on reports from HAL, indicates a number of statements made about plaintiff, his activities, and events on board the M/S *Oosterdam* .   These statements in combination were found by a United States Magistrate Judge to constitute probable cause for issuance of a search warrant for the search of plaintiff's laptop computer, for evidence of the crime of computer intrusion, in violation of 18 U.S.C. § 1030(a)(5)(A)(ii) and (B)(i).

Plaintiff filed this action for defamation asserting that he was falsely accused by HAL of computer hacking.  In moving for summary judgment, HAL contends that plaintiff cannot point to a single statement in the search warrant affidavit that is actually false.  However, as noted above, Mr. Mindingo did confirm in his deposition that HAL reported information that, taken together, indicated the possibility that plaintiff had hacked into the computer system.  The Court thus declines to adopt defendant's assertion that no false statements were made because it only reported what Mr. Dijkstra said.  As there are issues of fact surrounding what was actually reported, and whether those reports were in fact false, defendant's motion for summary judgment on this basis must be denied.[2]

II. Privilege/Immunity.

As a separate basis for summary judgment, HAL asserts that the statements to the FBI, even if

---

[2]The complaint proceeds from plaintiff's assertion that all statements regarding hacking were, in fact, false.  However, it appears that this was not ever actually determined.  The HAL investigation of the computer crash in the Fidelio system led to the conclusion that HAL employees had caused it.  However, the record before the Court does not indicate that other matters, such as plaintiff's entry into the Üradar system (which he admitted), and the conflict between the gateway log showing plaintiff off the ship, and the Ving card log showing him entering his room during that time, were ever resolved.  At trial, the burden remains on plaintiff to demonstrate that defendant's statements regarding these matters were false.  *Mohr v. Grant*, 153 Wash. 2d at 817.

ORDER - 6

false, were privileged under state law, and it is therefore immune from civil liability. "Even where falsity is not at issue, defamation claims are difficult to establish in part because a cornucopia of statutory and common law privileges protects defendants." *Tolan v. State of Washington*, 2005 WL 1378755 (W.D.Wash. 2005). The privilege asserted here is a statutory one under RCW 4.24.510, which states,

> A person who communicates a complaint or information to any branch or agency of federal, state, or local government . . . is immune from civil liability for claims based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency or organization. A person prevailing upon the defense provided for in this section is entitled to recover expenses and reasonable attorneys' fees incurred in establishing the defense and in addition shall receive statutory damages of $10,000. Statutory damages may be denied if the court finds that the complaint or information was communicated in bad faith.

RCW 4.24.510.[3] Defendant contends that it is entitled to immunity under this statute because it was required by law to report the hacking allegations. However, the provision cited by defendant is a regulation rather than a statute. It states, in relevant part, that

> . . . the vessel security officer must report each breach of security, unlawful act, or threat of an unlawful act against any of your passenger vessels to which this part applies, or against any person aboard it, that occurs in a place subject to the jurisdiction of the United States. You must report the incident to both the COTP and to the local office of the Federal Bureau of Investigation (FBI). Also, if your vessel is a U.S.-flag vessel, you must report each such incident that occurs at a place outside the jurisdiction of the United States to the hotline of the Response Center of the Department of Homeland Security. . . .

33 CFR § 120.220(a). Plaintiff initially argues this regulation provides that HAL should have reported to Homeland Security, rather than the FBI, because the computer incidents did not occur at a place subject to the jurisdiction of the United States. In response, defendant points out that the M/S *Oosterdam* is not a U.S.-flagged ship; her registry is in the Netherlands, so she is not required to report anything to Homeland Security. However, defendant has nowhere shown that the reported incidents occurred "in a place subject to the jurisdiction of the United States" to trigger the requirement of reporting to the FBI. The evidence indicates that on January 13 and 14, when most of the events took place, the ship was docked at Ocho Rios, Jamaica. Defendant has pointed to Mr. Dijkstra's allegations that plaintiff began

---

[3]Defendant's answer was recently amended, with leave of court, to add a counterclaim for statutory damages under this statute. This counterclaim was not before the Court in this motion for summary judgment.

ORDER - 7

attempting to hack into the ship's computer "the first thing", implying as soon as they boarded ship in Florida. However, the conclusion of the cited paragraph, taken from Mr. Dijkstra's deposition, indicates that this occurred in the evening of the first day of the cruise. There is absolutely no evidence in the record as to what time the ship departed from the dock, or where it was by that evening.

The "waters subject to the jurisdiction of the United States" are specifically defined in the regulations:

> *Waters subject to the jurisdiction of the United States* and *waters over which the United States has jurisdiction* mean the following waters---
>
> (a) navigable waters of the United States, as defined in § 236(a).
>
> (b) Waters, other than those under paragraph (a) of this section, that are located on lands for which the United States has acquired title or controls and—
>
>     (1) Has accepted jurisdiction according to 40 U.S.C. 255; or
>
>     (2) Has retained concurrent or exclusive jurisdiction from the date that the State in which the lands are located entered the Union.
>
> (c) Waters made subject to the jurisdiction of the United States by operation of the international agreements and statutes relating to the former Trust Territory of the Pacific Islands, and waters within the territories and possessions of the United States.

33 C.F.R. § 2.38 (italics as in original). For marine areas, "navigable waters" are defined as the "[t]erritorial seas of the United States." 33 C.F.R. § 236(a)(1). For purposes of statutes within Title 46 of the United States Code, criminal jurisdiction pursuant to Title 18, interpretation of international law, and certain other treaties and statutes, "territorial sea" means "the waters, 12 nautical miles wide, adjacent to the coast of the United States and seaward of the territorial sea baseline. . . ." 33 C.F.R. § 2.22(a)(1). For all other purposes, "territorial sea" means "the waters, 3 nautical miles wide, adjacent to the coast of the United States and seaward of the territorial sea baseline." 33 C.F.R. § 222(a)(2). However, for certain purposes, the Coast Guard may use the broader definition set forth in section (a)(1). 33 C.F.R. § 222(a)(3). The territorial sea baseline is normally the mean low water line along the coast of the United States. 33 C.F.R. § 2.20.

To the extent that there is any evidence that shows where the alleged computer activity occurred, that evidence points to Jamaica, well outside the territorial seas of the United States. The ship was

ORDER - 8

actually docked there, at Ocho Rios, on January 13 and 14, when Mr. Dijkstra reported his hacking allegations, and when those allegations were first reported to the FBI.  Mr. Mandingo testified at his deposition that his first report was "Tuesday or Wednesday", meaning the 13th or 14th of January.  Deposition of Mandingo, p. 36.  The computer crash and "gateway log" incidents also occurred on January 14 while the ship was docked at Ocho Rios.  Thus, HAL's assertion that it was "required" to report these matters to the FBI may be incorrect, because the alleged hacking incidents occurred on a Dutch-flagged vessel when it was docked at Jamaica or cruising near there, not "in a place subject to the jurisdiction of the United States."  33 C.F.R.§ 120.220(a).

Following the oral argument, defendant provided supplemental authority for the assertion that the M/S *Oosterdam* was in waters subject to the United States at the time of the incidents herein.   HAL offered as authority the preamble to the regulation itself, which states,

> This part applies to all passenger vessels over 100 gross tons, carrying more than 12 passengers;  making voyages lasting more than 24 hours, any part of which is one the high seas; and for which passengers are embarked or disembarked in the United States or its territories.

33 C.F.R § 120.100.   However, while the vessel M/S *Oosterdam* is unquestionably made subject to the subsequent regulations in this part, the § 120.220 reporting requirement is only triggered for a foreign-flag vessel if it is in a **place** subject to the jurisdiction of the United States.  The vessel is not, of itself, such a place.

Defendant has also cited to a criminal case in which the Eleventh Circuit Court of Appeals noted that

> merely because a vessel is of foreign registry or outside the territorial waters of the United States does not mean that it is beyond the jurisdiction of the United States. The United States has long taken the position that its jurisdiction extends to persons whose extraterritorial acts are intended to have an effect within the sovereign territory.

*United States v. Padilla-Martinez, et al.*, 762 F. 2d 942, 950 (11th Cir. 1985).   The court's language was based on 14 U.S.C. § 89, which "empowers the Coast Guard to search and seize any vessel on the high seas that is subject to the jurisdiction or operation of any law of the United States."  *Id*.  However, in using the disjunctive "or", the court did not address the situation here, of a vessel which is of foreign registry **and** outside the jurisdiction of the United States.  For that reason, as well as the fact that the

ORDER - 9

Coast Guard was not involved, the reasoning of this case is inapplicable here.

Actually, defendant may need not go so far afield to find a basis for jurisdiction over criminal acts committed on board the M/S *Oosterdam*. Pursuant to statute, the "special maritime and territorial jurisdiction of the United States" includes, to the extent permitted by international law, "any foreign vessel during a voyage having a scheduled departure from or arrival in the United States with respect to an offense committed by or against a national of the United States." 18 U.S.C. § 7(8). The cruise here both originated from and returned to Port Everglades, Florida, and those facts were alleged in Special Agent Nau's affidavit in support of the search warrant application. This section does not aid defendant, however, because HAL's defense theory is that Mr. Mandingo did not report a crime, but rather a security breach as required under regulations promulgated pursuant to the Marine Transportation Security Act of 2002.[4] Mandingo deposition, p. 26, 28. Mr. Mandingo testified that he was surprised when plaintiff was detained and his computer searched. Mandingo deposition, p. 144.

These matters go to the motive and purpose behind HAL's report to the FBI. Defendant has tied its RCW 4.24.510 immunity argument to the assertion that it was required under 33 C.F.R. § 120.220(a) to report the computer hacking allegations to the FBI. As set forth above, there are legal and factual issues regarding whether the computer hacking allegations fell within the reach of the reporting requirement, or even occurred within the jurisdiction of the United States. If not, the question arises as to whether the matter reported was "reasonably of concern" to the FBI, so as to fall under the statutory immunity. RCW 4.24.510.

Even if immunity under RCW 4.24.510 is appropriate, the privilege is defeated if the false statements were made with actual malice: that is, with knowledge of the statement's falsity or reckless disregard for its falsity. *Wood v. Battle Ground School District*, 107 Wash. App. 550, 562 (2001). The burden is on plaintiff to demonstrate with clear and convincing evidence that defendant acted with actual malice. *Harris v. City of Seattle*, 302 F. Supp. 2d 1200, 1203 (W.D.Wash. 2004), citing *Right-Price*

---

[4]This anti-terrorism provision, enacted as Public Law No. 107-295, 116 Stat. 2064, is codified in scattered sections of Titles 14, 16, 19, 33, and 46 of the United States Code. Defendant has not cited to any relevant statute, but rather to the regulations promulgated thereunder.

ORDER - 10

*Recreation v. Connells Prairie Community Council*, 146 Wash. 2d 370, 374 (2002).  As there are genuine issues of material fact as to whether defendant was required to report to the FBI, or whether it did so out of malice, summary judgment must be denied on defendant's claim of immunity.

III.  <u>Outrage/Intentional Infliction of Emotional Distress</u>.

HAL argues that plaintiff's claim of intentional infliction of emotional distress must fail because plaintiff cannot prove the elements.  A claim of intentional infliction of emotional distress is inseparable from a claim of outrage.  *Harris v. City of Seattle*, 315 F. Supp. 2d 1112, 1124 (W.D.Wash. 2004); citing *Dworkin v. Hustler Magazine, Inc.*, 867 F. 2d 1188, 1193 (9th Cir. 1989) and *Haubry v. Snow*, 106 Wash. App. 666, 680 (2001).  To support such claim, a plaintiff must prove (1) that defendant's conduct was "extreme and outrageous", (2) that defendant intentionally or recklessly inflicted emotional distress upon the plaintiff, and (3) that plaintiff has actually suffered a severe emotional distress as a result of defendant's outrageous conduct.  *Id.*  The defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*; citing *Haubry v. Snow*, 106 Wash. App. at 680.  The Court should make the initial determination as to whether reasonable minds could differ on whether the conduct was sufficiently extreme and outrageous to result in liability.  *Id*.;  *Robel v. Roundup Corp.*, 148 Wash. 2d 35, 43 ( 2002).   Only if reasonable minds could differ would the claim go to the jury.

Here, the Court finds that HAL's conduct in reporting Mr. Dijkstra's allegations to the FBI, together with the computer crash and gateway log discrepancy,  was not so "atrocious, and utterly intolerable in a civilized community" as to constitute the tort of outrage.   The ship's crew was faced with very bizarre behavior on the part of the two passengers, together with reports, by both of them, of unauthorized entry by plaintiff into the ship's computer network;  a contemporaneous crash of the Fidelio system; and a suspicious discrepancy between the gangway log and plaintiff's own door key log.  In light of the devastating possibilities that intrusion into certain areas of the ship's computer could have (especially on the navigation system), HAL personnel were only being prudent in investigating these matters.   And even if it should be determined, in the defamation claim, that the matter was improperly reported to the FBI, that report was not so outrageous in character, nor so extreme in degree, as to go

ORDER - 11

beyond "all possible bounds of decency." *Harris*, 315 F. Supp. 2d at 1124.

Further, plaintiff has not adequately alleged severe emotional distress. His argument in support of his outrage claim seems to be based mainly on the fact that he paid for a first-class ticket and therefore expected "white glove" treatment and "discreet service." See, Plaintiff's response, p. 13-15. However, plaintiff's expectations do not have any bearing on whether defendant's conduct was actually outrageous. He also complains that the promised letter of exoneration never materialized, that he suffered extreme embarrassment from being detained by the FBI, and that his reputation in the computer employment world has been tarnished. None of this, however, aids his claim of outrage, because defendant's conduct simply does not rise to that level. As this is not a determination upon which reasonable minds could differ, summary judgment is appropriate on this claim.

## CONCLUSION

Summary judgment is not warranted if a material issue of fact exists for trial. *Warren v. City of Carlsbad*, 58 F. 3d 439, 441 (9th Cir. 1995); *cert. denied*, 516 U.S. 1171 (1996). The underlying facts are viewed in the light most favorable to the party opposing the motion. *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159 (1970). However, once the moving party has net its initial burden, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. *Id*. at 324.

As set forth above, there are issues of material fact which preclude summary judgment as to the defamation claim only. Accordingly, defendant's motion for summary judgment (Dkt. # 20) is GRANTED as to plaintiff's claims of intentional and negligent infliction of emotional distress, and false light invasion of privacy, and these claims are DISMISSED. Defendant's motion for summary judgment

ORDER - 12

is DENIED as to the claim of defamation.

This matter is set for a bench trial on February 6, 2006. Due to a conflict in the Court's schedule, the trial shall not start until the following day, Tuesday, February 7, 2006. However, dates set for trial preparation in the scheduling order entered March 30, 2005 shall be maintained. The parties are also directed to contact the courtroom deputy at (206) 370-8521 to arrange for a judicial settlement conference prior to trial.

Dated this 20th day of January, 2006

*[signature]*

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER - 13